Filed 12/11/25  P. v. Johnson CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B322580 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA073696) |
| v. | |
| DEONTA DARRELL JOHNSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Deonta Darrell Johnson appeals his conviction and sentence for the murder of John Ruh. He argues that the trial court erroneously admitted hearsay statements from his accomplice Denmonne Lee, improperly instructed the jury it could consider "anything that [it] observed about the defendant while in the courtroom," and that the court coerced the jury into reaching a guilty verdict. As to his sentence, Johnson argues that the trial court abused its discretion by denying the People's motion to dismiss Johnson's special circumstance and firearm enhancements.

We affirm. The trial court did not err by admitting Lee's statements as statements against Lee's penal interest, nor did the court coerce the deadlocked jury. While the court erroneously instructed the jury it could consider "anything that [it] observed" about Johnson during trial, the error was not structural error or federal constitutional error but instead was state law error, and Johnson does not demonstrate prejudice on this record.[1] We further conclude that Johnson's claim of sentencing error is moot.

---

[1] As further explained in the discussion, we previously issued an order to show cause returnable in the trial court based on Johnson's petition for writ of habeas corpus alleging that the judge's answer to the jury's question violated the federal constitution and the California Racial Justice Act (Pen. Code, § 745). We express no opinion on the outcome of that habeas petition, which includes consideration of evidence outside the appellate record in this case.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Information*

On September 3, 2019, Johnson was charged with murder (Pen. Code, § 187, subd. (a))[2] with the special circumstance of robbery (§ 190.2, subd. (a)(17)).  The information further alleged Johnson personally used (§ 12022.53, subd. (b)) and intentionally discharged a firearm (§ 12022.53, subd. (c)), resulting in death or great bodily injury (§ 12022.53, subd. (d)).[3]

B.    *The Trial Evidence*

Johnson was tried by jury.  At trial, the People introduced evidence demonstrating the following.  On February 18, 2018, Ruh was working as a clerk at The Dairy, a convenience store in Lancaster.  Around 8:00 a.m., Johnson and Lee entered the store and asked Ruh for a cigarette.  Lee handed Ruh a dollar. Johnson stepped behind the sales counter and showed Ruh a gun, saying, "Get to the register, right now.  [Expletive], I'll shoot you."  Ruh replied, "With what? . . .  A pellet gun?"  Johnson shot Ruh once, but the gun jammed.  Johnson cleared the jam and shot Ruh two more times.  Johnson attempted to open the register, and he and Lee left The Dairy.  Ruh sustained three gunshot wounds and died at the scene.

---

[2]    Undesignated statutory references are to the Penal Code.

[3]    The information also alleged Johnson committed the crime for the benefit of a criminal street gang (§ 186.22, subds. (b)(1)(C), (b)(4)), but this allegation was dismissed on the People's motion before trial.

Using images of Johnson and Lee from surveillance footage near The Dairy, the Los Angeles County Sheriff's Department created a wanted flyer and held a press conference in March 2018 "seeking the public's assistance in trying to identify the[se] two individuals." About one week later, the sheriff's department received a call from Lee's girlfriend at the time, Monae Hawkins. Hawkins identified Lee as one of the suspects depicted on the flyer, and she told law enforcement that Lee had admitted to her he was the person on the flyer. Hawkins also reported that Lee told her Johnson was the shooter, although Hawkins only provided Johnson's first name and his nickname, "Fat Boy."

Hawkins testified at trial that she was dating Lee at the time and knew Johnson through Lee. At the time of the shooting, Hawkins, Johnson, and Lee were all living in Lee's mother's home. Sometime after the shooting, when Lee and Hawkins were alone at Lee's mother's house, Lee showed Hawkins a photo from the wanted flyer and asked, "Does that look like me?" Hawkins told Lee that it did look like him, and the other photo on the flyer looked like Johnson. A few days later, Lee showed Hawkins the flyer again while the two were in the car at a gas station and asked again whether the photo looked like him. Hawkins repeated that the photo looked like Lee.

Lee then told Hawkins what happened the day the man was killed at The Dairy. Lee stated that "Fat Boy said, 'Let's go hit a liq at The Dairy,'" meaning "let's go rob a [liquor] store." Lee said that Fat Boy wanted to rob The Dairy "[b]ecause there's an old man that worked there" and "[h]e thought that would be easy." Lee described that he and Johnson "walked to the store," Lee brought his gun, and Lee "handed the gun to Fat Boy." Lee and Johnson went into the store, and Johnson told Ruh to "put

4

his hands up," Ruh complied, "and Fat Boy just shot him, I guess, just for no reason."  Hawkins testified that, according to Lee, "Fat Boy told him, 'I'm just going to use the gun to scare the clerk,'" "[b]ut instead, like, he shot him."  Lee told Hawkins he was "scared" when Johnson shot Ruh.

Hawkins did not ever hear Johnson talk about what happened at The Dairy.  Hawkins asked Johnson at Lee's mother's house "if he killed that man," and Johnson responded, "'Yeah, you know I did,' and chuckled."

Hawkins was aware that Lee had a gun, and she saw the gun "a lot of times" before and after the shooting took place.  She testified that Lee's mother disposed of the gun sometime after the shooting.

Hawkins testified that she reported Lee's statements to the police by calling the number on the wanted flyer.  Hawkins acknowledged that she later spoke with Lee and his lawyer and told them her report to police was false.  Hawkins testified she was "scared" because Lee asked her to speak to his lawyer and Lee wrote a "weird song" about Hawkins saying she "snitched" and threatening to "shoot [her] through [her] eyes."  But after Hawkins recanted to Lee's lawyer, she contacted police again and told them her recantation was "a lie."

After Johnson impeached Hawkins's testimony, the People introduced as a prior consistent statement a recording and transcript of Hawkins's call on March 13 reporting Lee to the police.  The People similarly introduced a recording and transcript of a police interview with Hawkins on April 23, where she confirmed the details of her earlier report.

Johnson did not testify and introduced no evidence in his defense.  Lee, who was separately tried in juvenile proceedings, invoked his Fifth Amendment right not to testify at Johnson's trial.

C.    *Johnson's Conviction and Sentence*

The jury convicted Johnson of first degree murder, finding the special allegations true.  Johnson was sentenced to a life term without the possibility of parole.

Johnson timely appealed.

## DISCUSSION

A.    *Lee's Hearsay Statements Were Admissible*

Johnson argues Lee's statements about the shooting were improperly admitted as hearsay through Hawkins's testimony.  He asserts Lee's statements were inadmissible as declarations against penal interest because the statements were unreliable and not against Lee's penal interest.  Johnson further contends the admission of these statements violated the confrontation clause of the Sixth Amendment.

1.    *Additional Procedural History*

Before trial, the People indicated that Hawkins would testify as to Lee's statements about the robbery.  The People sought to introduce these hearsay statements as declarations against Lee's penal interest because Lee "admitted that he was part of a felony murder plot to rob The Dairy that turned into a murder," and the statements were trustworthy because they were "made to his girlfriend, not to law enforcement."

6

Johnson objected, arguing Lee's statements were not trustworthy because they showed Lee's "desire to get the gun out of [his] hand and into somebody[] else['s]." Johnson argued that, when Lee made the statements to Hawkins, he "was worried that there's a flyer that looks like him and he might be sometime soon thereafter arrested," so he wanted to "make sure that it's known he's not the one that fired the bullet that killed the individual." In Johnson's view, Lee had "tremendous incentive to do that . . . the minute he starts becoming worried that he is possibly being sought in a murder situation."

The court ruled that Lee's hearsay statements were admissible through Hawkins's testimony. The court deemed the statements trustworthy because Lee was "speaking from personal knowledge" and "talking to his girlfriend when she didn't even initiate the conversation," and the statements were made "in confidence and [within an] intimate relationship." The court also noted that although Lee named Johnson as the shooter, "the videotape [of the shooting] corroborates Mr. Lee," because the shooter and the non-shooter were of "distinctly different sizes," and Johnson's counsel conceded that the shooter did not "have a build similar to Mr. Lee." The court further ruled that Lee's statements were not testimonial within the meaning of the Sixth Amendment.

2. *The Trial Court Did Not Abuse Its Discretion by Concluding Lee's Statements Were Declarations Against Penal Interest*

a. *Governing Law and Standard of Review*

Evidence Code section 1230 provides, in relevant part: "Evidence of a statement by a declarant having sufficient

7

knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." To secure admission of a hearsay statement against the declarant's penal interest, "[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).) Here, Johnson and the People agree Lee was unavailable as a witness because he had invoked his Fifth Amendment right against self-incrimination.

"[T]he rationale underlying the [declaration against penal interest] exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) Accordingly, the focus of the exception "is the basic trustworthiness of the declaration." (*People v. Frierson* (1991) 53 Cal.3d 730, 745 (*Frierson*).) "'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion.'" (*Ibid.*) "We review the application of the statement against interest exception to the particular facts of a case for

8

abuse of discretion, but whether a trial court has correctly construed Evidence Code section 1230 is a question of law that we review de novo." (*People v. Flinner* (2020) 10 Cal.5th 686, 735 (*Flinner*).)

> b.       *Against Declarant's Interest*

Johnson argues Lee's statements were not truly against his penal interest because "they primarily served to minimize his own culpability" while "placing the great weight of the blame for the crime" on Johnson.

The California Supreme Court has stated that a hearsay statement that is "'in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others)'" does not qualify as a statement against penal interest. (*Duarte*, *supra*, 24 Cal.4th at p. 612.) This is because "'declarations against penal interest may contain self-serving and unreliable information'" in an "'attempt[] to shift blame or curry favor.'" (*Id.* at pp. 611-612, quoting *Williamson v. United States* (1994) 512 U.S. 594, 603 (*Williamson*).) "Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context." (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*); see *Duarte*, at p. 612.) "'The question . . . is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.'" (*People v. Cortez* (2016) 63 Cal.4th 101, 127 (*Cortez*), quoting *Williamson*, at pp. 603-604.)

9

The trial court did not abuse its discretion by determining that Lee's statements were against his penal interest. Lee admitted to joining Johnson in the robbery of The Dairy and giving Johnson his gun to threaten the victim. Although Lee stated Johnson was the shooter and he did not know that Johnson would kill Ruh, Lee's statements implicated himself in the robbery, placed himself at the scene of the murder, and identified his firearm as the murder weapon. (See *People v. Smith* (2017) 12 Cal.App.5th 766, 792 (*Smith*) [statements disserved declarant's penal interest by "put[ting] her at the scene of a burglary, robbery, and murder" and showing "she was there to assist [defendant] and was willing to follow his directions," despite "portray[ing] [declarant] as the more passive participant"]; *People v. Wilson* (1993) 17 Cal.App.4th 271, 276 [statement that declarant hid the gun that defendant had used to shoot victims was against her penal interest, and "[t]he fact that the statement is also disserving to [defendant] does not render the statement unreliable and inadmissible"]; cf. *People v. Vasquez* (2012) 205 Cal.App.4th 609, 624-628 [statement not against penal interest where declarant disclaimed any involvement in the robbery and assault by defendant].) At the time, as far as Lee knew, police had not identified the suspects in the murder, and they were asking the public for information. (See *Cortez, supra*, 63 Cal.4th at p. 127 [declarant's knowledge of the ongoing criminal investigation may demonstrate that his statement is against his penal interest if the statement could lead to his apprehension].) Given these circumstances, the trial court did not abuse its discretion by determining a reasonable person in Lee's position would not have made the statements unless he believed them to be true. (See *ibid.*)

Johnson argues that Lee's statements were far more inculpatory of Johnson than Lee, "[b]ecause Lee took minimal responsibility for the robbery and put all the blame for the murder on [Johnson]." Johnson asserts that "Lee knew he was in trouble and was trying to find a way to minimize his criminal exposure." But "the fact a hearsay statement portrays the declarant as a more minimal participant in a crime by itself does not require exclusion or end our analysis. . . . Only when there is both blame shifting by the declarant and *other* circumstances suggest some improper motive for the blame shifting have courts found admission of a hearsay statement error." (*Smith, supra,* 12 Cal.App.5th at p. 792; see *People v. Gordon* (1990) 50 Cal.3d 1223, 1252 (*Gordon*) [rejecting defendant's argument that a statement against penal interest was "untrustworthy" and "exculpatory" because "the criminal liability that the statement risks is not the highest," where the declarant's liability was "significant nonetheless" and other circumstances indicated reliability], overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835.) As we discuss further in the following section, Johnson does not identify any particular circumstances suggesting that Lee had a motive to lie to Hawkins or shift blame to Johnson during their conversation. (See *Cortez, supra,* 63 Cal.4th at p. 128 [affirming admission of statements where "the context in which [declarant] made the statements . . . does not suggest that [he] was trying to improve his situation with police"]; cf. *People v. Gallardo* (2017) 18 Cal.App.5th 51, 74-75 (*Gallardo*) [statements were not against penal interest where they were given in response to "leading questions or narrative statements by . . . informants" and declarant "complained that

11

law enforcement and a 'snitch' were trying to pin all of the blame for the offenses on him"].)

c.    *Sufficiently Trustworthy and Reliable*

Johnson similarly argues that Lee's statements were untrustworthy and unreliable because they were self-serving. "'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*Grimes*, *supra*, 1 Cal.5th at p. 711; *Frierson*, *supra*, 53 Cal.3d at p. 745.)

The trial court did not abuse its discretion by determining Lee's statements were trustworthy and reliable under the circumstances in which they were made. Lee made the statements to his then girlfriend Hawkins when the two were alone at his home, then alone in the car. (See *Flinner*, *supra*, 10 Cal.5th at p. 736 [statements "sufficiently reliable" where declarant "made the statements to a close friend, first at an intimate dinner and then in the privacy of his home"]; *Cortez*, *supra*, 63 Cal.4th at p. 128 ["the context in which [declarant] made the statements—a conversation with a close family member in an apartment he frequented—does not suggest that [declarant] was trying to improve his situation with police" and instead "'promoted truthfulness'"]; *Smith*, *supra*, 12 Cal.App.5th at p. 793 [statements that "were informal and made in the presence of friends" possessed "a great deal of reliability"].) Hawkins did not ask Lee about the robbery; instead, Lee raised the topic by showing her the wanted flyer and volunteering the story. (See

*People v. Arceo* (2011) 195 Cal.App.4th 556, 577 [affirming admission of statements that "were not made in a custodial context," but in ""'the most reliable circumstance,'" that is, "'one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures'""].)

Johnson relies on *Williamson, supra*, 512 U.S. 594, *Duarte, supra*, 24 Cal.4th 603, *People v. Robinson* (1991) 229 Cal.App.3d 1620, and *People v. Shipe* (1975) 49 Cal.App.3d 343 as "authorities requir[ing] exclusion of Lee's statements because they were only relatively inculpatory while placing far greater blame on [Johnson]." These cases, however, involved statements made in police custody. (See *Williamson*, at pp. 596-597, 601; *Duarte*, at pp. 611, 614; *Robinson*, at pp. 1623, 1625; *Shipe*, at p. 353.) As the California Supreme Court has noted, "the entire rationale underlying the against penal interest hearsay exception 'breaks down in a situation where a declarant in police custody seeks to exculpate himself by implicating another suspect.'" (*Duarte*, at p. 618.) Because Lee's statements were made under different noncustodial circumstances, these cases offer no support for Johnson's argument.

Johnson also cites *Lawley, supra*, 27 Cal.4th 102 and *People v. Smith* (2005) 135 Cal.App.4th 914, overruled on another ground as recognized in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291-292. Johnson argues that these cases demonstrate that "a statement made to a friend or acquaintance" is not always trustworthy or reliable. (See *Lawley*, at p. 152 [declarant speaking to fellow prison inmate]; *Smith*, at p. 919 [declarant speaking to girlfriend].) But in both cases, the hearsay statements at issue were not "specifically disserving of [the declarant's] interests" and were inadmissible for that reason.

13

(*Lawley*, at p. 154; see *Smith*, at p. 922.)  By contrast, as stated, the trial court here did not abuse its discretion by concluding that Lee's statements to Hawkins were specifically disserving of Lee's penal interest.

Finally, Johnson argues that the trial court misapplied Evidence Code section 1230 by finding that Lee's statements were reliable because they were corroborated by the surveillance video of the shooting.  In the related context of the Sixth Amendment right to confrontation, the United States Supreme Court has rejected that "evidence corroborating a hearsay statement may properly support a finding that the statement bears . . . trustworthiness guarantees," "since this would permit admission of presumptively unreliable statements, such as those made under duress, by bootstrapping on the trustworthiness of other evidence at trial."  (*Idaho v. Wright* (1990) 497 U.S. 805, 806.)  Even if the trial court erred by considering the surveillance video in assessing the reliability of Lee's statements, "'"we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm."'"  (*People v. Brooks* (2017) 3 Cal.5th 1, 39; see *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 [affirming on a different "theory of admissibility" that the trial court did not abuse its discretion by admitting certain evidence].)  Here, as stated, the trial court also determined that Lee's statements were reliable and trustworthy because they were spontaneously made to his girlfriend in a private setting.  We affirm the court's decision to admit the statements on this basis.

14

3. *Admitting Lee's Statements Did Not Violate the Confrontation Clause of the Sixth Amendment*

a. *Governing Law and Standard of Review*

The Sixth Amendment protects a criminal defendant's right to "confront[] . . . the witnesses against him." (U.S. Const., 6th Amend.) "'If a hearsay statement is being offered by the prosecution in a criminal case,'" and the declarant is unavailable for cross-examination, "'[a]dmission of such a statement violates the right to confrontation if the statement is *testimonial*.'" (*People v. Fayed* (2020) 9 Cal.5th 147, 168; accord, *People v. Sanchez* (2016) 63 Cal.4th 665, 680.)

Testimonial statements are those "given in the course of an interrogation or other conversation whose "'primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.""'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1214 (*Rangel*); accord, *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 291, fn. 26.) "'[T]he question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony.""'" (*Rangel*, at pp. 1214-1215.) Specifically, "[t]he statements and actions of both the declarant and [recipient] provide objective evidence of the primary purpose" of the conversation. (*Michigan v. Bryant* (2011) 562 U.S. 344, 367.) We independently review whether a statement was testimonial. (See *People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 825; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

The trial court did not err by concluding Lee's statements were not testimonial under the circumstances. "'[S]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to

be testimonial than statements given to law enforcement officers.'" (*Rangel*, *supra*, 62 Cal.4th at p. 1214.)  This is because "the confrontation clause addresse[s] the specific concern of '[a]n accuser who makes a formal statement to government officers' because that person 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812-813.)  Further, there is no evidence that, when privately speaking to his girlfriend, Lee "anticipated his statements would '"be used prosecutorially."'" (*Gallardo*, *supra*, 18 Cal.App.5th at p. 68 [no confrontation clause violation]; see *Crawford v. Washington* (2004) 541 U.S. 36, 51 ["casual remark to an acquaintance" is not testimonial]; *Gutierrez*, at pp. 812-813 [declarant's statement to a family member not testimonial].)  There is also no indication that Hawkins sought Lee's statements for the purpose of creating evidence to prosecute Lee or Johnson because Hawkins did not ask any questions and merely responded to Lee's questions about the wanted flyer.  Given these circumstances, Lee's remarks were not testimonial, and their admission did not violate the confrontation clause.

B. *The Trial Court Erred by Telling the Jury It Could Consider "Anything that [It] Observed" Regarding Johnson, but Johnson Does Not Demonstrate Prejudice*

Johnson argues the trial court violated his Sixth and Fourteenth Amendment rights by affirmatively answering a question from the jury during deliberations that it could use "anything that [it] observed about the defendant while in the

16

courtroom." We agree the court erred, but conclude Johnson has not demonstrated prejudice based on the record before us.[4]

1.     *Additional Procedural History*

During jury deliberations, the jury sent the court a question asking, "Can we use anything that we observed about the defendant while in the courtroom?" The court held the following colloquy with Johnson's counsel and the prosecution:

Court:     My belief is the answer is yes. Jury instruction CALCRIM 222 tells them: You must disregard anything you saw or heard when court was not in session even if it was done or said by one of the parties or witnesses.

---

[4]     While his appeal was pending, Johnson filed a petition for writ of habeas corpus in this court. The petition alleged the trial court's instruction to the jury violated the Fifth, Sixth, and Fourteenth Amendments, as well as the California Racial Justice Act (§ 745). The petition included new evidence outside the trial record, including a juror statement about the jury's deliberations.

We issued an order to show cause on Johnson's habeas petition returnable in the trial court, where the proceedings are ongoing. Because the habeas petition is based on a different record than the one before us, we make no determination on the merits of Johnson's habeas petition. (See *In re Figueroa* (2018) 4 Cal.5th 576, 587 ["Habeas relief may be warranted when the invalidity of a judgment is not apparent from the record on appeal."]; *In re Carpenter* (1995) 9 Cal.4th 634, 646 ["Appellate jurisdiction is limited to the four corners of the record on appeal."].)

17

We were always in session when the jury was present. We were always here and everything was done on the record. . . . I think the answer is yes.

[Prosecutor]: I agree.

Court: One of the issues is . . . the shooter, I think, is left handed; is that correct?

[Prosecutor]: Yes.

Court: And I believe the defendant at times was writing notes and he did have access to water. So they could have observed if he was right handed or left handed. I don't specifically recall seeing him writing, but I do remember him having notes. They could have observed his tattoos. They can observe his general build. He's a large man and they called him Fat Boy. And that's no disrespect to you, but that was the nickname that was used attributed to him and he's physically a large man.

So I think that's all fair game. It's no different than doing an ID and showing a picture and letting them look at the defendant, and say, does this look like him to me? They don't have to rely specifically on the testimony only, they can use their own observations of what's going on.

So I think the simple answer is yes.

18

| [Defense counsel]: | Your Honor, I do not know of any case law, statutory law, that would establish that the answer to the juror's question would be no.  So I don't have any argument to make on that in that way.  The defense would submit at this time. |

The trial court responded "Yes" to the jury's question.

> 2. *Governing Law and Standard of Review*

The Sixth and Fourteenth Amendments guarantee a jury verdict "based on evidence received in open court."  (*Sheppard v. Maxwell* (1966) 384 U.S. 333, 351; see *id.* at p. 362; see also *Taylor v. Kentucky* (1978) 436 U.S. 478, 485; *Turner v. Louisiana* (1965) 379 U.S. 466, 472.)  This principle "'goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury.'"  (*People v. Nesler* (1997) 16 Cal.4th 561, 578 ["'Due process means a jury *capable and willing to decide the case solely on the evidence before it*.'"].)  Due process prohibits a conviction based on "outside influence" (*Sheppard*, at p. 351; see *Turner*, at pp. 473-474) or "on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial" (*Taylor*, at p. 485).

"'The touchstone of due process is fundamental fairness'" (*People v. Lemcke* (2021) 11 Cal.5th 644, 655 (*Lemcke*)), but "'the category of infractions that violate "fundamental fairness"'" is "'very narrow[]'" (*Estelle v. McGuire* (1991) 502 U.S. 62, 73 (*Estelle*)).  This is because "'[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.' [Citations.]  The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the

19

expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." (*Medina v. California* (1992) 505 U.S. 437, 443 (*Medina*); see *Marshall v. Lonberger* (1983) 459 U.S. 422, 438, fn. 6 [due process does not entail "a finely tuned review of the wisdom of state evidentiary rules"].)

"A jury instruction may "'so infuse[] the trial with unfairness as to deny due process of law.'" [Citation.] However, "'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'""'" (*Lemcke, supra,* 11 Cal.5th at p. 655; accord, *People v. Huggins* (2006) 38 Cal.4th 175, 192; see *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 ["'it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment'"].) If the instruction is ambiguous, "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle, supra,* 502 U.S. at p. 72.) We consider the jury instruction ""'in the context of the instructions as a whole and the trial record.'"" (*Lemcke*, at p. 655.)

Evidence of a defendant's physical appearance is not constitutionally protected. Under the Fifth Amendment privilege against self-incrimination, a criminal defendant cannot be compelled to testify at trial (see *Spielbauer v. County of Santa*

*Clara* (2009) 45 Cal.4th 704, 714), and his decision not to testify may not be cited as evidence of guilt (see *Griffin v. California* (1965) 380 U.S. 609, 615). But the Fifth Amendment affords "'no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.'" (*United States v. Dionisio* (1973) 410 U.S. 1, 6.) Accordingly, as the trial court noted, the Constitution does not prohibit a jury from considering a defendant's physical appearance in connection with the trial evidence. (See *Schmerber v. California* (1966) 384 U.S. 757, 763-764 (*Schmerber*) [comparing defendant's facial features with photographic evidence]; accord, *People v. Montalvo* (1971) 4 Cal.3d 328, 335 [ascertaining defendant's age as an element of the crime].)

But a nontestifying defendant's demeanor or conduct in the courtroom does not generally constitute evidence of guilt. (See *People v. Garcia* (1984) 160 Cal.App.3d 82, 91 (*Garcia*); accord, *People v. Bloom* (2022) 12 Cal.5th 1008, 1048; *People v. Boyette* (2002) 29 Cal.4th 381, 434 (*Boyette*) [comment on "defendant's courtroom demeanor" as evidence of guilt is "improper . . . unless such comment is simply that the jury should ignore a defendant's demeanor"]; *People v. Prince* (1988) 203 Cal.App.3d 848, 855; but see *People v. Foster* (1988) 201 Cal.App.3d 20, 25 [defendant's "throat-slitting gesture" toward a witness during trial was admissible and relevant to consciousness of guilt].) This is because "a defendant's nontestimonial conduct in the courtroom does not fall within the definition of 'relevant evidence' as that which 'tends logically, naturally, [or] by reasonable inference to prove or disprove a material issue' at trial. [Citations.] Neither

21

can it be properly considered by the jury as evidence of defendant's demeanor since demeanor evidence is only relevant as it bears on the credibility of a witness.  (Evid. Code, § 780.)" (*Garcia*, at p. 91; accord, *Boyette*, at p. 434.)  Drawing attention to a nontestifying defendant's behavior or demeanor may also "infringe[] on the defendant's right not to testify" under the Fifth Amendment.  (*Boyette*, at p. 434; accord, *People v. Heishman* (1988) 45 Cal.3d 147, 197, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190, 1195.)

We review de novo a constitutional claim on undisputed facts.  (See *People v. Frazier* (2020) 55 Cal.App.5th 858, 864; see *In re Taylor* (2015) 60 Cal.4th 1019, 1035 ["'[w]hen the application of law to fact is predominantly legal, such as when it implicates constitutional rights . . . [our] review is de novo'"].)  We address the applicable harmless error standard in the discussion below.

3. *The Court's Response to the Jury's Question Was Erroneous*[5]

Here, the jury could draw several "'permissible inferences'" from its observations of Johnson during trial.  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 (*Albarran*); accord, *People v.*

---

[5]    Although Johnson did not object to the instruction at trial, he argues that the instruction affected his substantial rights. (See § 1259 [appellate court may "review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Mitchell* (2019) 7 Cal.5th 561, 580 ["[defendant] claims that the flawed instructions deprived him of due process, and because this would affect his substantial rights if true, his claim is not forfeited"].)

*Fuiava* (2012) 53 Cal.4th 622, 697; see *People v. Coneal* (2019) 41 Cal.App.5th 951, 972.)  As the trial court noted in its colloquy with counsel, the jury could consider Johnson's "tattoos," his "general build," and whether he was "right handed or left handed" in determining Johnson's guilt.  To the extent the court's answer to the jury's question allowed the jury to consider Johnson's physical appearance in this manner, the trial court did not err.  (See *Garcia, supra*, 160 Cal.App.3d at p. 91, fn. 7 [a jury may "view[] the defendant's physical appearance to see if it comports with a physical description given by a witness or to determine if the physical appearance of a defendant supports a factual finding that must be made by the trier of fact"].)

To be sure, the court did not so instruct the jury and the jury did not merely ask whether it could consider Johnson's physical appearance for identification purposes, but rather whether it could consider "anything that [it] observed about the defendant while in the courtroom."  The court should have advised the jury that it could not consider Johnson's behavior or demeanor in court as evidence of his guilt because Johnson did not testify, and thus his demeanor was not relevant to the matters at trial.  (See *Garcia, supra*, 160 Cal.App.3d at pp. 91-92.)  The court's answer to the jury's question was thus erroneous as it failed to advise the jury that Johnson's behavior or demeanor was irrelevant.  (See *id.*)

The California Constitution provides that "trial error does not merit reversal of a judgment unless 'the error complained of has resulted in a miscarriage of justice.'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 699.)  "'Error that occurs during the presentation of the case to the jury is generally trial error; an error that erroneously adds to or subtracts from the record before

23

the jury can "be quantitively assessed in the context of the other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." [Citations.] A court in such circumstances can meaningfully ask "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."'" (*People v. Anzalone* (2013) 56 Cal.4th 545, 553-554 (*Anzalone*).) If the error is constitutional, we apply the standard of *Chapman v. California* (1967) 386 U.S. 18 and must "reverse the conviction unless the People can demonstrate that the error was harmless beyond a reasonable doubt." (*People v. Reese* (2017) 2 Cal.5th 660, 671; see *Chapman*, at p. 26.) If it was state law error, under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) the error is generally harmless unless "the defendant has demonstrated that it is '"reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."'" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195 (*Gonzalez*); see *Watson*, at p. 836.)

By contrast, "'certain errors, by their nature, result in a "miscarriage of justice" within the meaning of the California harmless-error provision requiring reversal without regard to the strength of the evidence received at trial.'" (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1073, quoting *People v. Cahill* (1993) 5 Cal.4th 478, 493.) Structural error may result from "a violation of state law or federal constitutional law." (*Gonzalez, supra,* 5 Cal.5th at p. 196.) Examples include "deprivation of the right to counsel," "denial of the right to trial by an impartial judge," when a party is not permitted to "present its entire case before the trier of fact," and "improper discrimination in jury selection." (*In re Christopher L.*, at p. 1073.) Structural errors "are those that go to the very construction of the trial mechanism" and

24

"require[] per se reversal because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred. For example, it would be impossible to divine how a trial would have proceeded if a defendant had been allowed counsel or the trial judge not been biased." (*Ibid.*) There is a "strong presumption" that an error is susceptible to harmless error analysis, with structural error being a "rare case." (*Anzalone, supra*, 56 Cal.4th at p. 554.)

Based on the record presently before us (and as further explained below), the trial court's error was not structural, but susceptible to harmless error analysis because it was state law instructional error or at most involved evidentiary error that merely "erroneously adds to or subtracts from the record before the jury." (*Anzalone, supra*, 56 Cal.4th at p. 553.) Indeed, the California Supreme Court has consistently analyzed similar claims for harmless error. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1223 [prosecutor's comment on nontestifying defendant's "demeanor or behavior" was harmless "under the applicable federal or state standard of review"]; *Boyette, supra*, 29 Cal.4th at p. 437 [same].)

### a.    *Structural Error*

Johnson asserts the court's instruction constituted structural error and reversal is mandatory. He contends the instruction permitted the jury to use "unadmitted pseudo-evidence to decide [his] guilt" "after evidence had closed, the parties made their arguments, and [Johnson] had no chance to respond."

In support, Johnson relies heavily on a federal appellate case, *United States v. Noushfar* (9th Cir. 1996) 78 F.3d 1442

(*Noushfar*).  In that case, the district court "allowed the jury to take to the jury room fourteen tapes that had not been played in the courtroom" without any instructions.  (*Id.* at p. 1444.)  The tapes contained "many potentially incriminating conversations with the defendants" from an undercover investigation.  (*Ibid.*)  The Ninth Circuit reversed the defendant's conviction, based on a likely confrontation clause violation and a violation of "one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during the trial." (*Id.* at p. 1445.)  The court determined the error was structural because it "violate[d] the basic framework of the trial system, which requires that evidence be presented and tested in front of the jury, judge and defendant." (*Ibid.*)

The error in *Noushfar* differs from the error in this case.  In Johnson's case, there was no additional substantive evidence introduced to the jury during deliberation and no subversion of the regular trial process.  Rather, the jury asked and was instructed that it could consider information about Johnson that it had previously observed firsthand in open court.  (See *People v. Gurule* (2002) 28 Cal.4th 557, 598, fn. 8 ["'It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table.'"], quoting *Riggins v. Nevada* (1992) 504 U.S. 127, 142; accord, *Garcia*, *supra*, 160 Cal.App.3d at p. 91, fn. 7 [it is "routine practice" for a jury to "view[] the defendant's physical appearance"].)  For these reasons, we reject Johnson's claim of structural error and review for harmless error.

### b.    *Federal Constitutional Error*

Johnson next argues the court's instruction violated his federal due process rights by rendering the trial fundamentally unfair.  (See *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 ["'it is the appellant's burden to affirmatively demonstrate error'"]; accord, *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)  But as stated, the federal Constitution does not require "'an exclusion of [a defendant's] body as evidence when it may be material.'"  (*Schmerber, supra*, 384 U.S. at p. 763.)

Although evidence of Johnson's courtroom demeanor or behavior was not legally relevant, the consideration of such evidence does not necessarily violate federal due process.  (See *Andrew v. White* (2025) 604 U.S. 86, 93, fn. 3 (*Andrew*) [noting that the United States Supreme Court precedent has not held "that the introduction of all irrelevant evidence violates the Due Process Clause," but "rather, that due process protects defendants from the introduction of evidence so prejudicial as to affect the fundamental fairness of their trials"].)  On the record before us, there is no indication the jury's potential consideration of Johnson's behavior or demeanor was "so prejudicial as to affect the fundamental fairness of [his] trial[]."  (*Id.* at p. 93, fn. 3; see *id.* at p. 87 [allowing habeas claim to proceed based on allegation that "irrelevant" evidence of defendant's "sex life and about her failings as a mother and wife" violated due process]; *People v. Garcia* (2014) 229 Cal.App.4th 302, 315-316 ["potentially inflammatory" evidence of defendant's "sexual orientation was not relevant to motive or any other issue in the case," violating due process]; *Albarran, supra*, 149 Cal.App.4th at pp. 228, 230 [similar, as to "irrelevant" evidence "identifying other gang members and their unrelated crimes," which was "extremely and

27

uniquely inflammatory"].)  Without any similar inflammatory or prejudicial evidence of Johnson's demeanor or conduct appearing in the appellate record before us, we cannot conclude there was a "'reasonable likelihood'" that the jury applied the trial court's response to the jury's question in a way that violated Johnson's federal due process rights.  (*Estelle, supra,* 502 U.S. at p. 72.)

Citing *United States v. Carroll* (4th Cir. 1982) 678 F.2d 1208, Johnson argues the court's instruction violated his constitutional rights.  In *Carroll,* the prosecutor argued in closing that the defendant was guilty of a bank robbery because, during the trial, the defendant and his attorney examined photographs of the bank in evidence.  (*Id.* at p. 1209.)  The prosecutor argued that the defendant "knew more about the pictures than the lawyer did," and "the reason he knew so much about those pictures is because he was in the bank there at the robbery." (*Ibid.*)  The appellate court reversed the conviction, holding that the Fifth and Sixth Amendments are violated when "the prosecutor describes the courtroom behavior of a defendant who has not testified, and then goes on to tell the jury that it may consider that behavior as evidence of guilt."  (*Id.* at p. 1210.)  The court concluded that the prosecutor's comment infringed on the defendant's "right to counsel, including the right to assist his counsel in his own defense."  (*Id.* at p. 1209.)

Unlike the prosecutor in *Carroll*, here the trial court did not identify or emphasize any specific instances of Johnson's behavior or demeanor and then tell the jury it could consider such evidence as evidence of his guilt.  Nor can the trial court's one word answer ("Yes") to the jury's question be reasonably construed as casting aspersions on Johnson's exercise of his constitutional rights not to testify and to participate in his

28

defense. (See *Medina, supra*, 505 U.S. at p. 443 [in the context of criminal procedure, due process operates to secure "'the specific guarantees enumerated in the Bill of Rights'"].)

### c. *Johnson Demonstrates State Law Error, but Not Prejudice under* Watson

As stated, to the extent the court's answer to the jury's question allowed the jury to consider irrelevant demeanor or conduct evidence, Johnson has demonstrated state law error only. (See *Garcia, supra*, 160 Cal.App.3d at p. 91 ["a defendant's nontestimonial conduct in the courtroom does not fall within the definition of 'relevant evidence'"]; accord, *Boyette, supra*, 29 Cal.4th at p. 434; see Evid. Code, §§ 350 ["No evidence is admissible except relevant evidence."], 780, subd. (a) [demeanor evidence relevant to testifying witness].) For state law errors, we review for prejudice under the *Watson* standard: whether the defendant has demonstrated "'that it is reasonably probable that a result more favorable to [him] would have been reached in the absence of the error.'" (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746.) "'"[A] 'probability' in this context does not mean more likely than not, but merely *a reasonable chance*, more than an *abstract possibility*."'" (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050 (*Richardson*).)

On the record before us, Johnson does not show prejudice. As noted, Johnson does not identify any particular instance of his conduct or demeanor during the proceedings that might have influenced the jury's verdict, such as a disruption or emotional display, or interactions with others. (See, e.g., *Boyette, supra*, 29 Cal.4th at p. 434 [defendant "smiling and waving" at jury]; *Garcia, supra*, 160 Cal.App.3d at p. 87 [defendant "jeering or

29

making facial motions of jest" during the trial].)  Additionally, as the trial court identified during its colloquy with counsel outside the presence of the jury, the prosecutor argued in closing that Johnson had "distinctive tattoos on his wrist on his right hand" and that surveillance footage depicted the shooter "pulling and tugging" on his right sleeve to "basically cover[] up his entire hand."  The prosecutor further argued that the jury should "consider" that the shooter was "left-handed."  The prosecutor focused on Johnson's physical characteristics, and it would be speculative to conclude the jury saw or relied on something not reflected in the record.  (Cf. *People v. Hendrix* (2022) 13 Cal.5th 933, 946 [considering "whether the nature of the evidence leaves us '"in serious doubt as to whether the error affected the result"'"].)

Johnson argues that he suffered prejudice "because the jury hung and eventually found [him] guilty, [and] there is more than a reasonable probability that, with the court's permission, at least one juror used unadmitted uncrossed 'evidence'" of his demeanor or conduct.  Without any indication in the record before us that the jury used or perceived such evidence and considered it for an improper purpose, however, Johnson has not demonstrated a "reasonable chance" that the trial court's erroneous instruction contributed to the verdict.  (*Richardson*, *supra*, 43 Cal.4th at p. 1051; cf. *People v. Peters* (1972) 23 Cal.App.3d 522, 535 [introduction of irrelevant evidence was harmless where the jury's interpretation of the evidence was "a matter of speculation"].)

C.   *The Trial Court's Instruction Directing Further Jury Deliberation was Not Erroneous*

Johnson next argues the court delivered a coercive instruction when the jury announced it could not reach a verdict. We determine the trial court did not err.

1.   *Additional Procedural History*

On the second day of jury deliberations, the jury sent the court a note that it was unable to reach a verdict. Defense counsel asked the court to declare a mistrial, and the prosecutor asked the court to order further deliberations. The court noted it did not think the jury had "been deliberating for a long time," and "[t]hey've asked for no assistance, no read back, they have not asked for anything from the court." The court indicated it would instruct the jury to keep deliberating using the "*Moore Whaley* instruction" from *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*) and *People v. Whaley* (2007) 152 Cal.App.4th 968 (*Whaley*). Defense counsel reviewed and did not object to this instruction.

The jury subsequently requested and received readback of Hawkins's trial testimony. The jury then returned a guilty verdict on all counts.

2.   *Governing Law and Standard of Review*

"'Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties . . . or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) "The

31

determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court." (*People v. Miller* (1990) 50 Cal.3d 954, 994.) "'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.'"'" (*People v. Debose* (2014) 59 Cal.4th 177, 209 (*Debose*).) The trial court may not improperly coerce a deadlocked jury by singling out jurors in the minority to reconsider their views, expressing an opinion that a verdict should be reached, indicating that the case will be retried if the jury could not agree, or emphasizing the costs of the trial and retrial. (See *People v. Reed* (2018) 4 Cal.5th 989, 1015; *People v. Hinton* (2004) 121 Cal.App.4th 655, 660 (*Hinton*).) Rather, the trial court should "convey[] that jurors d[o] not need to reach a verdict, and that they should not acquiesce in a verdict with which they d[o] not agree." (*Reed*, at p. 1016.)

We review the trial court's direction to a deadlocked jury for abuse of discretion. (See *Debose*, *supra*, 59 Cal.4th at p. 209; accord, *People v. Breaux* (1991) 1 Cal.4th 281, 319 (*Breaux*).) "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265; accord, *Breaux*, at p. 319.)

### 3. *The Trial Court's Instruction Was Not Coercive*

Johnson argues the instruction "expressly communicated to [the] jurors, especially the dissenters, that the court expected them to reach a verdict," it "discouraged the dissenting jurors from holding their positions, and it minimized the importance of the dissenting juror(s)' positions and the seriousness of the consequences to the defendant." Johnson concedes, however, that "the instructions here did not expressly single out dissenting jurors" and "the court acknowledged that the jury might not be able to reach a verdict." For instance, the court's instruction stated: "You should try to agree on a verdict if you can. Each of you must decide the case for yourself but only after you have discussed the evidence with the other jurors." Johnson also acknowledges that a "nearly identical" instruction was upheld in *Moore, supra,* 96 Cal.App.4th 1105, but he contends that *Moore* was wrongly decided.

First, we note that Johnson forfeited any objection to the instruction given by the trial court. (See *People v. Butler* (2009) 46 Cal.4th 847, 882, fn. 18 [holding forfeited a claim of coercive deadlock instruction and noting "that defense counsel's failure to object tends to 'indicate[] that the potential for coercion argued now was not apparent to one on the spot'"].) Second, Johnson provides no persuasive basis to depart from *Moore*. (See *Whaley, supra,* 152 Cal.App.4th at p. 982 [rejecting defendant's argument that "*Moore* was wrongly decided and should not be followed"]; *Hinton*, *supra*, 121 Cal.App.4th at p. 661 [describing *Moore* instruction as "a model for how to instruct the jury following its initial deadlock"].)

33

Further, under the circumstances presented, the court's instruction was not coercive. The instruction did not single out jurors in the minority and did not emphasize the costs of the trial or a potential retrial. (See *Breaux*, *supra*, 1 Cal.4th at p. 320 [no abuse of discretion where "[t]he judge made no threats, no statements that could be interpreted as exerting undue pressure on any juror"]; cf. *Hinton*, *supra*, 121 Cal.App.4th at pp. 659-660 [coercive instruction to "instruct[] jurors holding a minority position to question that position in light of the majority's view" and "indicate[] the case would be retried if the jury could not agree"].) Moreover, the deadlock instruction stated that the jurors should try to reach a verdict "if you can do so without . . . violence to your own individual judgment." The court emphasized that "[b]oth the People and the defendant are entitled to [the] individual judgment of each juror." (See *Breaux*, at p. 320 [judge "did not indicate that a verdict had to be reached and reminded the jurors of their right to an individual opinion"]; *People v. Sheldon* (1989) 48 Cal.3d 935, 960 [same].)

D.    *Johnson's Claim of Sentencing Error Based on Special Directive 20-08 is Moot*

Johnson also argues the trial court abused its discretion by declining to consider Special Directive 20-08 when it denied the People's motion to dismiss Johnson's special circumstance and firearm enhancements. He requests that "the matter should be remanded for the court to consider Special Directive 20-08 in deciding whether to grant the prosecutor's motion."

Section 1385 authorizes the trial court to "dismiss an enhancement if it is in the furtherance of justice to do so." (§ 1385, subd. (c)(1).) At the time of Johnson's sentencing in

34

2022, former Los Angeles County District Attorney George Gascon had issued Special Directive 20-08, "instruct[ing] deputy district attorneys in pending cases to move to dismiss or withdraw sentence enhancement allegations" under section 1385. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 486 (*Nazir*).) Before Johnson's trial, the People moved to "dismiss all alleged special circumstances, sentencing enhancements, alleged strikes (if any) and alleged allegations" in Johnson's case pursuant to Special Directive 20-08. The trial court denied the People's motion, stating it would not consider "what may happen in the future with Mr. Gascon's policies" but "only the case that's before me," and that it determined dismissal was not in the interests of justice.

Johnson's claim of error is now moot. On December 3, 2024, newly elected Los Angeles County District Attorney Nathan Hochman issued Special Directives 24-04 and 24-05, which rescinded Special Directive 20-08.[6] We can no longer provide Johnson with the relief he requests because Special Directive 20-08 is no longer in effect and would not bear on the trial court's sentencing decision on remand. (See *In re D.P.* (2023) 14 Cal.5th 266, 276 ["A case becomes moot when events "render[] it impossible for [a] court, if it should decide the case in favor of [appellant], to grant him any effect[ive] relief.""];

---

[6] On our own motion, we take judicial notice of Special Directives 24-04 and 24-05. (See *Nazir*, *supra*, 79 Cal.App.5th at p. 487, fn. 2 [judicially noticing special directive under Evid. Code, § 452, subd. (c), as a policy of an executive agency].)

cf. *Ghost Golf, Inc. v. Newsom* (2024) 102 Cal.App.5th 88, 97 [appeal was moot where executive order at issue was rescinded].)[7]

## DISPOSITION

The judgment is affirmed.


MARTINEZ, P. J.


We concur:



SEGAL, J.                                FEUER, J.

---

[7]     As the trial court erred only in one respect, and this error was nonprejudicial, we reject Johnson's claim of cumulative error. (See *People v. Thomas* (1992) 2 Cal.4th 489, 544 [cumulative error claim "must fail" when based on one "nonprejudicial" error].)